

## Fourth Court of Appeals
### San Antonio, Texas

### MEMORANDUM OPINION

No. 04-23-00481-CV

**IN RE J.O.A.**, N.N.A., H.H.A., A.R.L.L., M.A.L.L., Children

From the 131st Judicial District Court, Bexar County, Texas
Trial Court No. 2022-PA-00449
Honorable Charles E. Montemayor, Judge Presiding

Opinion by:     Beth Watkins, Justice

Sitting:        Patricia O. Alvarez, Justice
                Beth Watkins, Justice
                Liza A. Rodriguez, Justice

Delivered and Filed: August 16, 2023

AFFIRMED

M.R. appeals the trial court's order terminating her parental rights to J.O.A. (a son born 2015), N.N.A. (a son born 2016), H.H.A. (a son born 2017), A.R.L.L. (a son born 2020), and M.A.L.L. (a daughter born 2021).[1] M.R. argues the evidence is legally and factually insufficient to support the trial court's finding that termination is in the best interest of the children. We affirm the trial court's order.

### BACKGROUND

On March 21, 2022, the Texas Department of Family and Protective Services removed all five children from M.R. and J.L.'s care. Before that date, the Department had received repeated

---

[1] To protect the privacy of the minor children, we use initials to refer to the children and their biological parents. TEX. FAM. CODE ANN. § 109.002(d); TEX. R. APP. P. 9.8(b)(2).

reports of drug use by and domestic violence between M.R. and J.L. On that date, there was a shooting in the children's home. The Department obtained temporary managing conservatorship over the children, placed J.O.A. and H.H.A. in a therapeutic home together, placed N.N.A. in a different therapeutic home, placed A.R.L.L. and M.A.L.L with fictive kin, and filed a petition to terminate the parental rights of M.R., J.A. (the father of J.O.A., N.N.A., and H.H.A.), and J.L. (the father of A.R.L.L. and M.A.L.L.). The Department also created a family service plan requiring M.R. to, as a condition of reunification, inter alia: complete a psychological assessment, therapy, parenting classes, and domestic violence courses; abstain from drugs and submit to random drug testing; and demonstrate that she had stable housing and income. The Department ultimately pursued termination of M.R., J.A., and J.L.'s parental rights.

Approximately eleven months after removal, the trial court held a two-day bench trial at which M.R. appeared. The trial court heard testimony from four witnesses: (1) the Department's caseworker, Jessica McCada; (2) the CASA volunteer; (3) M.R.'s aunt, Antoinette Rosas; and (4) M.R. After the trial, the trial court signed an order terminating M.R., J.A., and J.L.'s parental rights pursuant to section 161.001(b)(1)(N) and (O) and its finding that termination of their parental rights was in the best interest of the children. M.R. timely appealed.[2]

## ANALYSIS

In a single issue, M.R. challenges the legal and factual sufficiency of the trial court's finding that termination is in the best interest of the children.

### *Applicable Law and Standard of Review*

The involuntary termination of a natural parent's rights implicates fundamental constitutional rights and "divests the parent and child of all legal rights, privileges, duties, and

---

[2] J.A. and J.L. are not parties to this appeal.

powers normally existing between them, except for the child's right to inherit from the parent." *In re S.J.R.-Z.*, 537 S.W.3d 677, 683 (Tex. App.—San Antonio 2017, pet. denied) (internal quotation marks omitted). "As a result, appellate courts must strictly scrutinize involuntary termination proceedings in favor of the parent." *Id.* The Department had the burden to prove, by clear and convincing evidence, both that a statutory ground existed to terminate M.R.'s parental rights and that termination was in the best interest of the children. TEX. FAM. CODE ANN. § 161.206; *In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003). "'Clear and convincing evidence' means the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX. FAM. CODE ANN. § 101.007; *In re S.J.R.-Z.*, 537 S.W.3d at 683.

When reviewing the sufficiency of the evidence supporting a trial court's order of termination, we apply well-established standards of review. *See In re J.F.C.*, 96 S.W.3d 256, 263 (Tex. 2002). In reviewing the legal sufficiency of the evidence to support the trial court's findings, we look "at all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true." *In re J.O.A.*, 283 S.W.3d 336, 344 (Tex. 2009). In reviewing the factual sufficiency of the evidence, we consider disputed or conflicting evidence. *Id.* at 345. A factual sufficiency review requires us to consider the entire record to determine whether the evidence that is contrary to a finding would prevent a reasonable factfinder from forming a firm belief or conviction that the finding is true. *See id.* The factfinder is the sole judge of the weight and credibility of the evidence. *Id.* at 346.

### *Best Interest*

#### *Applicable Law*

M.R. challenges the sufficiency of the trial court's order that termination of her parental rights was in the best interest of the children. There is a strong presumption that a child's best

interest is served by maintaining the relationship between a child and the natural parent, and the Department has the burden to rebut that presumption by clear and convincing evidence. *See, e.g.*, *In re R.S.-T.*, 522 S.W.3d 92, 97 (Tex. App.—San Antonio 2017, no pet.). To determine whether the Department satisfied this burden, the Texas Legislature has provided several factors[3] for courts to consider regarding a parent's willingness and ability to provide a child with a safe environment, and the Texas Supreme Court has used a similar list of factors[4] to determine a child's best interest. TEX. FAM. CODE ANN. § 263.307(b); *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976).

A best interest finding, however, does not require proof of any particular factors. *See In re G.C.D.*, No. 04-14-00769-CV, 2015 WL 1938435, at *5 (Tex. App.—San Antonio Apr. 29, 2015, no pet.) (mem. op.). Neither the statutory factors nor the *Holley* factors are exhaustive, and "[e]vidence of a single factor may be sufficient for a factfinder to form a reasonable belief or conviction that termination is in the child's best interest." *In re J.B.-F.*, No. 04-18-00181-CV, 2018 WL 3551208, at *3 (Tex. App.—San Antonio July 25, 2018, pet. denied) (mem. op.). Additionally, evidence that proves a statutory ground for termination is probative on the issue of best interest.

---

[3] These factors include, inter alia: "(1) the child's age and physical and mental vulnerabilities; (2) the frequency and nature of out-of-home placements; (3) the magnitude, frequency, and circumstances of the harm to the child; (4) whether the child has been the victim of repeated harm after the initial report and intervention by the department; (5) whether the child is fearful of living in or returning to the child's home; (6) the results of psychiatric, psychological, or developmental evaluations of the child, the child's parents, other family members, or others who have access to the child's home; (7) whether there is a history of abusive or assaultive conduct by the child's family or others who have access to the child's home; (8) whether there is a history of substance abuse by the child's family or others who have access to the child's home; (9) whether the perpetrator of the harm to the child is identified; (10) the willingness and ability of the child's family to seek out, accept, and complete counseling services and to cooperate with and facilitate an appropriate agency's close supervision; (11) the willingness and ability of the child's family to effect positive environmental and personal changes within a reasonable period of time; (12) whether the child's family demonstrates adequate parenting skills [. . .]; and (13) whether an adequate social support system consisting of an extended family and friends is available to the child." TEX. FAM. CODE § 263.307(b).

[4] Those factors include: (1) the desires of the child; (2) the emotional and physical needs of the child now and in the future; (3) the emotional and physical danger to the child now and in the future; (4) the parental abilities of the individuals seeking custody; (5) the programs available to assist those individuals to promote the best interest of the child; (6) the plans for the child by these individuals or the agency seeking custody; (7) the stability of the home or proposed placement; (8) the acts or omissions of the parent that may indicate the existing parent-child relationship is not a proper one; and (9) any excuse for the acts or omissions of the parent. *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976).

*In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002). Finally, in determining whether termination of the parent-child relationship is in the best interest of a child, a factfinder may judge a parent's future conduct by her past conduct. *In re E.D.*, 419 S.W.3d 615, 620 (Tex. App.—San Antonio 2013, pet. denied).

*Application*

Because M.R. has not challenged the trial court's findings under sections (N) and (O), we must accept their validity. *See In re A.V.*, 113 S.W.3d at 361–62; *In re S.J.R.-Z.*, 537 S.W.3d at 682–83. We, therefore, accept the trial court's finding that M.R.:

> constructively abandoned the child[ren] who [had] been in the . . . temporary managing conservatorship of the Department . . . for not less than six months, and
>
> (i) the [D]epartment has made reasonable efforts to return the child[ren] to the parent;
>
> (ii) the parent has not regularly visited or maintained significant contact with the child[ren]; and
>
> (iii) the parent has demonstrated an inability to provide the child[ren] with a safe environment.

TEX. FAM. CODE ANN. § 161.001(b)(1)(N). We must also accept the trial court's finding that M.R.:

> failed to comply with the provisions of a court order that specifically established the actions necessary for the parent to obtain the return of the child[ren] who [have] been in the . . . temporary managing conservatorship of the Department . . . for not less than nine months as a result of the child[ren]'s removal from the parent under Chapter 262 for the abuse or neglect of the child[ren].

TEX. FAM. CODE ANN. § 161.001(b)(1)(O); *see In re A.V.*, 113 S.W.3d at 361–62 (relying on grounds evidence to review best interest finding); *In re C.H.*, 89 S.W.3d at 28 (same).

At trial, McCada testified that she reviewed the family service plan with M.R. in March of 2022 and M.R. appeared to understand it. According to McCada, M.R. completed only one aspect of her family service plan—the parenting class. M.R., in contrast, testified that she had completed several services and had sent certificates of completion to McCada. As factfinder, the trial court

was the sole judge of the weight and credibility of the evidence and was free to credit McCada's testimony and discredit M.R.'s testimony. *See In re D.M.*, 452 S.W.3d 462, 472 (Tex. App.—San Antonio 2014, no pet.) (noting, in best-interest determination, "a trial court is not bound to accept the truth or accuracy of a parent's testimony, either as to past actions or future intentions"). It is undisputed, however, that in the months before trial, that M.R. "ha[d] been active in her services." *See* TEX. FAM. CODE § 263.307(b)(10) (evaluating willingness/ability of child's family to complete counseling services in best-interest determination).

Here, there is an emotional bond between M.R. and the children.[5] The Department presented evidence that she attended supervised visitation "every week," that the visits were appropriate, and that M.R. "does a pretty good job in her visits." The CASA volunteer testified that during her visits, M.R. was appropriate in her interactions with the children "but she's not able to control them. If there was any type of behavioral outburst, she required the [outside] assistance. . . . [She] also did not take the youngest boy [] to the restroom and he had many accidents even though she was told that he was potty training and needed to be taken to the restroom frequently." *See* TEX. FAM. CODE § 263.307(b)(12) (examining whether the child's family demonstrates adequate parenting skills).

Turning to the Department's concerns about M.R.'s mental health, McCada testified that M.R. underwent the psychological evaluation the family service plan called for but had not followed through with the required additional assessments. M.R. began engaging in the therapy called for by her service plan in December; when asked why she waited so long to engage when she had been referred in March, she admitted to McCada that she "was still engaging in substance

---

[5] The children were all under the age of eight when trial began. The trial court could have determined that their youth made them more vulnerable to future harm. *See* TEX. FAM. CODE § 263.307(b)(1) (reviewing child's age and vulnerabilities as part of best-interest determination).

abuse." M.R. also admitted that she had stopped taking the medications prescribed for her mental health because "[she] felt like [she] didn't need to [take them]."

On the first day of trial, the CASA volunteer did not recommend termination of M.R.'s parental rights. By the second day of trial, however, the CASA volunteer recommended that "[a]ll parental rights be terminated." She explained that M.R.: had been diagnosed with bipolar disorder, schizophrenia, and an anxiety disorder; had removed herself from all psychotropic medications; was only taking herbal medications; and had not talked to a doctor about that decision. The CASA volunteer, who had previously been a therapist, testified that M.R. had not addressed her mental health, and further testified, "[h]aving a mental health diagnosis is not the reason I'm concerned. The reason I'm concerned is her lack of understanding of her mental health diagnosis, her lack of willingness to learn about her mental health diagnosis, and her lack of familiar support, and community support around her mental health diagnosis." *See* TEX. FAM. CODE § 263.307(b)(6) (examining results of psychiatric/psychological evaluations of parent in best-interest determination); *see also In re J.K.K.B.*, No. 13-13-00309-CV, 2013 WL 5970419, at *5 (Tex. App.—Corpus Christi–Edinburg Oct. 31, 2013, no pet.) (mem. op.) (reasoning parent's unmet mental health challenges weighed in favor of termination). M.R.'s unmet mental health challenges support the trial court's termination decision.

One of the Department's primary concerns for M.R. was domestic violence. According to McCada, M.R. and J.L. were mutual perpetrators of domestic violence with each other. She testified M.R. had started the domestic violence course called for by her family service plan, although she did not enroll in that course until December, and she was not able to complete it before trial began. There were "some signs, but not very many" that M.R. was applying what she was learning in that course—her interactions with the children had started to improve, but she was

still having contact with J.L., who was in jail. McCada testified that M.R. and J.L. were "having phone calls at the jail every day."

In contrast, on the first day of trial, M.R. testified she was no longer in contact with J.L., that he had called one time to ask about his kids "and that was it." She claimed she "already stated to him that I've moved on," represented to the court that she had ended their relationship on February 15, 2023, and explicitly denied having contact with him after that date. After receiving this evidence, the court reset the case and said:

> I have a little skepticism about the mother telling the father, "Oh, the kids are doing well. Don't you call me. I've moved on with my life."
>
> I kind of have a very strong skepticism that that's the way it went. I have a feeling it was - - for lack of a better way to characterize it, romantic. And if - - Well - - And so, I'm a little worried that someone is trying to be deceptive to this Court, which is a real - - for lack of a better word, and I'm sorry, piss-off. . . .
>
> But it's extremely troubling that there's such a domestic violence dysfunctional relationship that occurred. And perhaps there's a lot of contact going on between [J.L.] and mom that's problematic.
>
> Here's what we're going to do, I'm going to reset y'all to a date and I want to hear all these conversations. I want to hear the length of them. . . .
>
> I want to hear every conversation between mom and [J.L.]. Be prepared to present it, be prepared to do whatever is necessary for that, because, frankly, I think this goes to the credibility of the mother.

When trial resumed, the Department admitted recordings of several phone calls as well as e-mails M.R. sent to and received from J.L. while he was incarcerated. In a call J.L. made to M.R. on her November 23, 2022 birthday, M.R. said, "[t]here were plenty of times the boys saw us fighting. . . . [N.N.A.] is the main one where he saw you [] hit my head against the wall and choke me. . ." and that the children were "all old enough to remember the fights between [M.R.] and [J.L.] and the sex [and] the drugs." Then they discussed a plan to deceive the Department by "giving" custody of the children to a family member but maintaining daily contact with them. McCada testified that the conversation was concerning to her "[b]ecause I feel like kids with

family, that, you know, family is going to be willing to give them back to mom right off the bat when she hasn't completed all her services and gotten the help she needs."

The court also heard a recorded jail call from February 15, 2023—the date M.R. represented to the court she had ended her relationship with J.L. In that recording, M.R. did not end her relationship with J.L. Instead, they laughed after J.L. said he had told someone that he and M.R. "were not together." In the same conversation, they talked about having sex when he was released from jail and J.L repeatedly expressed possessiveness and jealously of M.R. They ended the phone call with each saying, "I love you."

Contradicting M.R.'s testimony that she had not spoken to J.L. since February 15, 2023, on March 31, 2023, McCada testified that "from January until recently," there were "[a]pproximately, like 70 or more" phone calls between M.R. and J.L., and that M.R. remained in contact with J.L. after February 15 through e-mail and letters. McCada described one of those e-mails:

> Q.     And what's concerning about this e-mail?
>
> A.     . . . [I]t talks about how [M.R.] wants him to discuss what he's going to say, what she wants to say and say that they're done with their relationship, to go along with it. And that she's going to . . . record the conversation and give it to the Judge on [the day the trial reconvened].
> And she's like, 'I'm not leaving you. I do really need you right now. I'm crying.'
> And then states that they're probably looking at the calls like they did in Bexar County. And she states again that she's not leaving you. 'I'm just saying I need you to go along with whatever I tell you is in the best interest of me and my kids.'
>
> Q.     And what's the date on that?
>
> A.     3/9/2023.
>
> Q.     And do you recall when our last hearing was?
>
> A.     It was 3/9/2023.

On the second day of trial, the CASA volunteer was also concerned about M.R. continuing a relationship with J.L. "because [M.R.] has routinely told me that she is no longer in communication with [J.L.]. That she does not want to know anything that's going on with [J.L.], and has turned a new leaf. And all this is not true since the recordings have come out. So her ability to tell me the truth makes me question anything and everything she's told me."

After the trial court heard the recordings, M.R. testified again and swore that she was no longer in a relationship with J.L. She explained that she no longer answered his calls and had blocked his number. Again, the trial court, as factfinder, was free to discredit M.R.'s testimony. *In re D.M.*, 452 S.W.3d at 472; *see also* TEX. FAM. CODE § 263.307(b)(3) (examining magnitude/frequency/circumstances of harm to child); TEX. FAM. CODE § 263.307(b)(7) (assessing history of abusive or assaultive conduct by family or others who have access to child's home); *In re A.L.S.*, 660 S.W.3d 257, 264 (Tex. App.—San Antonio 2022, pet. denied) ("It is not necessary that the parent's conduct be directed at the child or that the child actually be injured; rather, a child is endangered when the environment or the parent's course of conduct creates a potential for danger which the parent is aware of but disregards."). It is in the best interest of a child to not be placed in conditions or surroundings that endanger the child's physical or emotional well-being. *In re A.L.S.*, 660 S.W.3d at 275–76.

Another of the Department's other primary concerns was about M.R.'s drug use. While the case was pending, the Department sent M.R. to drug test twice per month; she "missed about ten" of those tests. In the five months before trial, McCada testified M.R.'s test results showed that she had been sober. M.R. testified she had "been clean eight months already." *See In re J.O.A.*, 283 S.W.3d at 346 ("[E]vidence of improved conduct, especially of short-duration, does not conclusively negate the probative value of a long history of drug use and irresponsible choices.").

The family service plan also required M.R. to obtain stable housing and employment. M.R. did not have stable housing at the time of trial—she was living with her mother and stepfather but testified she was "in the process of getting housing." She testified her parents were willing to take the children into their home while she waited for housing. According to McCada, though, M.R.'s mother and stepfather were not appropriate placements because they "have previous history of domestic violence as well, and there are criminal history concerns, and CPS as well, and drug use." *See* TEX. FAM. CODE § 263.307(b)(7) (evaluating history of abusive or assaultive conduct by family/others with access to home). McCada testified that M.R.'s "mom had a case not that long ago where she beat up her niece that was pregnant. . . ." McCada also explained that M.R.'s mother had tested positive for marijuana and methamphetamines. TEX. FAM. CODE § 263.307(b)(8) (examining history of substance abuse by family/others with access to home).

In terms of stable employment, McCada testified that three to four months before trial, M.R. began "sending [McCada] pay stubs to show that she is getting paid." *See* TEX. FAM. CODE § 263.307(b)(11) (reviewing willingness/ability of child's family to effect positive environmental/personal changes in a reasonable time). McCada further testified that while her children were in the Department's care, M.R. did not provide any sort of support for her children, even though she sent J.L. money in jail. *See id*. M.R. denied sending J.L. money in jail. M.R. testified that she made $500 to $600 every two weeks, and that was enough to support her children. According to McCada, though, M.R. had "made comments to us that she cannot afford her kids and that she is not able to take them on full-time." *See* TEX. FAM. CODE § 263.307(b)(12) (examining whether the child's family demonstrates adequate parenting skills).

The CASA volunteer ultimately advocated for termination of M.R.'s parental rights, explaining "the fact that she's consistently lied to me about her relationship with [J.L.], about her employment status, about looking for a home. I believe it's in the best interest and the safety of

the children that her rights be terminated." *See In re J.O.A.*, 283 S.W.3d at 346 (noting the factfinder is the sole judge of the weight and credibility of the evidence).

The trial court was concerned about the Department's permanency plan for the children. McCada testified that the Department did not really have a permanency plan for the three older children—the therapeutic homes where the three older children were living were not potential long-term placements—but was hoping for an unrelated adoption. In contrast, the Department planned for M.R.'s godmother, who was currently caring for the two younger children, to adopt them, noting she is licensed by the State and the two younger children were bonded to her. McCada testified that M.R.'s godmother would be able to meet the physical and emotional needs of the two younger children now and in the future.

M.R.'s aunt testified that she was willing to have the children placed with her. But the Department believed the aunt's home was inappropriate because her fiancé, with whom she lived, was a sex offender. On this point, M.R. was asked:

Q.      Does it concern you that if the Department placed the kids with this family, that this sex offender would reoffend on your children?

A.      No, not at all. Not in my mind.

Q.      Okay. Have you met this man?

A.      No.

McCada ultimately testified that termination was in the best interest of the children because M.R. was not able to meet the physical needs of all her children now and in the future, and the CASA volunteer agreed.

After reviewing the evidence under the appropriate standards of review, we conclude a reasonable factfinder could have formed a firm belief or conviction that termination of M.R.'s parental rights was in the best interest of her children. *In re J.F.C.*, 96 S.W.3d at 266. We therefore

hold that legally and factually sufficient evidence supports the trial court's best interest finding and overrule M.R.'s arguments to the contrary.

**CONCLUSION**

We affirm the trial court's order of termination.

Beth Watkins, Justice